FILED
2012 Oct-10  PM 02:41
U.S. DISTRICT COURT
N.D. OF ALABAMA



# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | |
|---|---|
| **PORTER CAPITAL CORPORATION,** ) | |
| ) | |
| **PLAINTIFF,** ) | |
| ) | |
| **VS.** ) | **2:11-cv-1620-JHH** |
| ) | |
| **WILLIS HARALSON;** | |
| **HUGH HARALSON, III, and** ) | |
| **JERRY HARALSON,** | |
| ) | |
| **DEFENDANTS.** ) | |

## MEMORANDUM OPINION

The court has before it the Motion (Doc. #30) for Summary Judgment filed by

Plaintiff Porter Capital Corporation ("Porter Capital") on July 30, 2012.  Pursuant to

the court's order (Doc. #33) of July 31, 2012, the Motion (Doc. #30) for Summary

Judgment was deemed submitted, without oral argument, to the court for review as

of August 29, 2012.

## I.      PROCEDURAL HISTORY

Plaintiff Porter Capital commenced this action on May 16, 2011 by filing a

single count complaint in this court for breach of guaranty.  (*See generally* Compl.).

Plaintiff's Motion (Doc. #30) for Summary Judgment asserts that no genuine issue

of material fact exists as to the breach of guaranty claim and that Porter Capital is entitled to judgment as a matter of law.

The parties have each filed briefs and submitted evidence in support of their respective positions concerning the Motion (Doc. #30) for Summary Judgment.  On July 30, 2012, Plaintiff submitted evidence (Doc. #32, Exhs. A-I)[1] in support of the Motion (Doc. #30) for Summary Judgment and also filed a supporting brief (Doc. #31).  Defendants Willis Haralson, Hugh Haralson, III, and Jerry Haralson filed a response (Doc. #34) to the Motion (Doc. #30) for Summary Judgment on August 22, 2012, along with evidence (Doc. #35, Exhs. 1-9),[2] a brief (Doc. #36), and a statement of facts (Doc. #37).  On August 29, 2012 Porter Capital filed a reply (Doc. #41) to the

---

[1] Porter Capital submitted: the affidavit of Sal Trupiano (Exhibit A); the affidavit of Marc Solomon (Exhibit B); the declaration of Marc Solomon (Exhibit C); portions of the deposition testimony of Sal Trupiano (Exhibit D); portions of the deposition testimony of Hugh Haralson, III (Exhibit E); portions of the deposition testimony of Willis Haralson (Exhibit F); portions of the deposition testimony of Jerry Haralson (Exhibit G); Willis Haralson's Responses to First Set of Requests for Admission (Exhibit H); and Jerry Haralson's Responses to First Set of Requests for Admission (Exhibit I).

[2] The Haralson Defendants submitted: the Complaint (Exhibit 1); the Answer and Defenses (Exhibit 2); Hugh Haralson's Responses to First set of Interrogatories (Exhibit 3); Willis Haralson's Responses to First Set of Interrogatories (Exhibit 4); Jerry Haralson's Responses to First Set of Interrogatories (Exhibit 5); portions of the deposition of Sal Trupiano (Exhibit 6); portions of the deposition of Hugh Haralson, III (Exhibit 7); portions of the deposition of Jerry Franklin Haralson (Exhibit 8); and portions of the deposition of Willis Cochran Haralson (Exhibit 9).

opposition, along with additional evidence (Doc. #42, Exhs. A-C)[3] and a reply (Doc. #43) to Defendants' statement of facts.

## II.    STANDARDS FOR EVALUATING SUMMARY JUDGMENT

Under Federal Rule of Civil Procedure 56,[4] summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000).  The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact.  *See id.* at 323.  Once the moving party has met its burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and by its own affidavits, or by the depositions, answers to interrogatories, and admissions

---

[3]  Porter Capital submitted: additional portions of the deposition testimony of Hugh Haralson, III (Exhibit A); additional portions of the deposition testimony of Willis Haralson; and additional portions of the deposition testimony of Jerry Haralson (Exhibit C).

[4]  Federal Rule of Civil Procedure 56 was amended on December 1, 2010.  However, even with the 2010 amendments, "the standard for granting summary judgment remains unchanged."  FED. R. CIV. P. 56 Advisory Committee's Note (2010 Amendments).

on file, designate specific facts showing that there is a genuine issue for trial. *See id.* at 324.

The substantive law will identify which facts are material and which are irrelevant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *See id.* at 249.

The method used by the party moving for summary judgment to discharge its initial burden depends on whether that party bears the burden of proof on the issue at trial. *See Fitzpatrick*, 2 F.3d at 1115-17 (*citing United States v. Four Parcels of Real Property*, 941 F.2d 1428 (11th Cir. 1991)(*en banc*)). If the moving party bears the burden of proof at trial, then it can only meet its initial burden on summary judgment by coming forward with positive evidence demonstrating the absence of a genuine issue of material fact; i.e. facts that would entitle it to a directed verdict if not controverted at trial. *See Fitzpatrick*, 2 F.3d at 1115. Once the moving party makes

4

such a showing, the burden shifts to the non-moving party to produce significant, probative evidence demonstrating a genuine issue for trial.

If the moving party does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in either of two ways.  First, the moving party may produce affirmative evidence negating a material fact, thus demonstrating that the non-moving party will be unable to prove its case at trial.  Once the moving party satisfies its burden using this method, the non-moving party must respond with positive evidence sufficient to resist a motion for directed verdict at trial.

The second method by which the moving party who does not bear the burden of proof at trial can satisfy its initial burden on summary judgment is to affirmatively show the absence of evidence in the record to support a judgment for the non-moving party on the issue in question.  This method requires more than a simple statement that the non-moving party cannot meet its burden at trial but does not require evidence negating the non-movant's claim; it simply requires the movant to point out to the district court that there is an absence of evidence to support the non-moving party's case.  *See Fitzpatrick*, 2 F.3d at 1115-16.  If the movant meets its initial burden by using this second method, the non-moving party may either point out to the court record evidence, overlooked or ignored by the movant, sufficient to withstand a directed verdict, or the non-moving party may come forward with additional

5

evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency.  However, when responding, the non-movant can no longer rest on mere allegations, but must set forth evidence of specific facts.  *See Lewis v. Casey*, 518 U.S. 343, 358 (1996) (*citing Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)).

## III.   RELEVANT UNDISPUTED FACTS[5]

### A.   The Financing Arrangement

On or about February 23, 2011 Porter Capital made available to Lady Forest Farms, Inc. ("Lady Forest") a line of credit in the amount of $1,000,000 (the "credit line") as evidenced by the Commercial Financing Agreement ("Financing Agreement").  (*See* Doc. #31 at 3-4, ¶¶ 1, 7; *see also* Doc. #37 at 1-2, ¶¶ 1, 7).  The Financing Agreement states its effectiveness "for a period commencing on the date hereof [February 23, 2011] and continuing until the close of business on the first anniversary of the date hereof."  (Exh. A to Compl., ¶ 11.1).  The purpose of the

---

[5]  If the facts are in dispute, they are stated in the manner most favorable to non-moving party. *Fitzpatrick*, 2 F.3d at 1115.

The Haralson Defendants filed a Response (Doc. #37) to Plaintiff's Statement of Undisputed Facts which at times disagrees with Plaintiff's statement of the facts.  However, the Response notes only general disputes, and does not cite to any specific portion of the record in support of the dispute.  The court will engage in its best efforts to understand Defendants' disputes using Defendants' Memorandum (Doc. #36) but cannot be expected to parse the record to find citation evidence for each one of Defendants' general disputes.

Financing Agreement was for Lady Forest to obtain short-term financing by selling, transferring, setting over and assigning to Porter Capital Corporation certain accounts receivable and invoices held by Lady Forest at a discount below their face value. (*See* Exh. A to Compl., ¶ 1).

The Financing Agreement provides that Porter Capital establish and maintain a reserve account (the "Reserve Account") for Lady Forest, and that upon payment of an account receivable factored by Porter Capital pursuant to the Financing Agreement, fifteen percent (15%) of the account receivable paid is held by Porter Capital in the Reserve Account.  (*See* Doc. #31 at 24, ¶ 2; Doc. #37 at 1, ¶ 2; *see also* Exh. A to Compl., ¶ 5.2).  Pursuant to Paragraph 22 of the Financing Agreement, Lady Forest is obligated to reimburse Porter Capital for the actual amount of all fees, costs and expenses, including but not limited to, attorney's fees, which Porter Capital may incur in any action to enforce the Financing Agreement or any related transaction, or in connection with any bankruptcy or insolvency proceeding commenced by Lady Forest.  (*See* Doc. #31 at 4, ¶ 3; Doc. #37 at 1, ¶ 3; *see also* Exh. A to Compl., ¶ 22).

The Haralson Defendants guaranteed all obligations of Lady Forest, jointly and severally, pursuant to the Performance Covenant and Waiver (the "Performance Covenant") incorporated into the Financing Agreement as Exhibit F.  (*See* Exh. A to

Compl. at Exh. F, "Performance Covenant"). The Performance Covenant and Waiver was executed by each of the Defendants as an unconditional guarantee to Porter Capital of the full payment and prompt and faithful performance of all present and future indebtedness and obligations of Lady Forest to Porter Capital – including, without limitation, Lady Forest's obligations under the Financing Agreement. (*See* Doc. #31 at 3-4, ¶ 4; Doc. #37 at 2, ¶ 4; *see also* Performance Covenant). As further security for its obligations under the Financing Agreement, Lady Forest guaranteed a security interest in certain collateral pursuant to the "Security Agreement" which is incorporated into the Financing Agreement as Exhibit D and executed by Lady Forest on February 23, 2011. (*See* Doc. #31 at 3, ¶ 5; *see also* Doc. #37 at 2, ¶ 5; Exh. A to Compl. at Exh. D, "Security Agreement").

### B.    Lady Forest's Bankruptcy

Porter Capital and Lady Forest performed under the Commercial Financing Agreement for a period of forty-one (41) days, from February 23, 2011 to April 5, 2011. (*See* Trupiano Dep. at 57-58). On April 5, 2011, forty-one (41) days after execution of the Financing Agreement, Lady Forest filed a voluntary petition for bankruptcy under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Mississippi, Jackson Division, Case

No. 11-01259-NPO (the "Bankruptcy Case").[6]  (*See* Doc. #31 at 4, ¶ 8; *see also* Doc. #37 at 2, ¶ 8).   On May 7, 2011 Lady Forest moved to convert its Chapter 11 bankruptcy case to a Chapter 7 case.   That request was granted by the Bankruptcy Court on May 24, 2011.  (*See* Doc. #31 at 4, ¶ 9; *see also* Doc. #37 at 2, ¶ 9).   On July 11, 2011, Lady Forest filed its schedules in its Bankruptcy Case, including Schedule E, which is a list of creditors holding unsecured priority claims.   On Schedule E Lady Forest declared under oath that it had over $158,194.11 in unpaid 2010 ad valorem taxes.   (*See* Doc. #31 at 4, ¶ 10; *see also* Doc. #37 at 2, ¶ 10).

## C.     Alleged Default under the Loan Documents

Porter Capital holds the Loan Documents (the Performance Covenant, Security Agreement, and Financing Agreement) and owns any indebtedness evidenced thereby.  (*See* Doc. #31 at 3, ¶ 6; *see also* Doc. #37 at 2, ¶ 6).   Porter Capital contends that Defendants are in default of their Obligations under the Loan Documents for failure to make payment when due.  (*See* Trupiano Aff., ¶ 10).   As evidence thereof, Porter Capital sets out paragraph 12.2 of the Financing Agreement:

> In further consideration of Porter Capital's undertakings in this Agreement, [Lady Forest] shall pay to Porter Capital a fee in an amount

---

[6]   There were no purchases by Porter Capital of any Lady Forest accounts receivable in May 2011 or in any of the remaining months of 2011 thereafter.  (*See* Trupiano Dep. at 57-58). The last purchase of Lady Forest's accounts receivable occurred in April 2011.  (*See id.* at 57-58, 75).

equal to three percent of the Base Purchase Amount (the "Facility Fee")
as of the termination date of the Initial Term and of each renewal term,
but the amount thereof shall be reduced by the total fees paid by [Lady
Forest] to Porter Capital in each term.

(*See* Exh. A to Compl., ¶ 12.2).   The credit facility was made available to Lady

Forest, however, only for 41 days – the period of time from the inception of the

Financing Agreement to the filing of bankruptcy.[7]   (*See* Doc. #43 at 1, ¶¶ 1, 3).

Nevertheless, Porter Capital contends that Lady Forest owes the full twelve-month

facility fee of $270,000 (which is 3% of $9,000,000) less the $26,764.63 fees already

paid by Lady Forest to Porter Capital, for a total Facility Fee of $243,235.37

remaining due and owing.   (*See* Doc. #31 at 5, ¶¶ 13, 14).

In addition to amounts owing under the Facility Fee, Porter Capital alleges that

Lady Forest owes an additional $18,000.   Porter Capital paid off a debt of Lady

Forest in bankruptcy court; certain creditors of Lady Forest (collectively referred to

herein as "R.W. Farms") asserted that they had sold live chickens to Lady Forest and

that they maintained a trust on Lady Forest's property pursuant to the Packers and

Stockyard Act, 7 U.S.C. §§ 181-229 (1921).   (*See* Doc. #31 at 5, ¶ 15; *see also* Doc.

#37 at 3, ¶ 15).   Porter Capital believed that such a trust would have given the R.W.

---

[7] Because Lady Forest filed for bankruptcy Porter Capital could not extend credit to Lady
Forest under the Financing Agreement thereafter.   *See* 11 U.S.C. §§ 364, 365(c)(2).   Lady Forest
counters that Porter Capital made a business decision to no longer advance monies to Lady
Forest under the Financing Agreement as of April 5, 2011, but does not make any argument
disputing the workings of the bankruptcy code.   (*See* Doc. #36 at 9).

Farms creditors a superpriority lien vis-a-vis Porter Capital.  (*Id.*)  Therefore, in order to preserve its rights under the Loan Documents, Porter Capital settled the claim with R.W. Farms for $18,000.  (*See* Doc. #31 at 5, ¶ 16).  Porter Capital contends that it is entitled to recovery of the additional $18,000 under Paragraph 10(b) of the Financing Agreement.[8]  (*See* Trupiano Aff., ¶ 15).

Finally, Porter Capital contends that the guarantors of Lady Forest owe for legal services performed by Burr & Forman LLP in connection with this action in the amount of –  as of July 30, 2012 – $68,922.00 with an additional expense fee of $6,513.10.  (*See* Doc. #31 at 6, ¶¶ 18, 19).  The total sum of $336,670.47 is offset by the Reserve Account amount of $36,934.51 used to fund the debt, making the total recovery sought by Porter Capital (as of July 30, 2012) to be $299,735.96.  (*See* Doc. #31 at 6, ¶¶ 18, 19, 20).

Defendants dispute that any actual indebtedness is owed to Porter Capital based on the fact that prior to May 2011, Porter Capital had made 100% collection of all of the accounts receivable it had purchased from Lady Forest.  (*See* Doc. #37 at 2, ¶ 6; *see also* Trupiano Dep. at 58-59).  More specifically:

---

[8]  Paragraph 10(b) of the Financing Agreement states that Lady Forest will "pay or reimburse Porter Capital for all its costs and expenses incurred with the enforcement or preservation of any rights under the Transaction Documents, and the verification of the Accounts Receivable and the credit worthiness of the Customers, including, without limitation, fees and disbursements of counsel to Porter Capital."  (Exh. A to Compl., ¶ 10.b.).

- For the five days in February 2011 during which Porter Capital held Lady Forest's accounts receivable, Lady Forest factored $336,704.20 with Porter Capital. (*See* Trupiano Dep. at 57-58).

- In March 2011, Lady Forest Factored $1,633,629.27 with Porter Capital. (*See* Trupiano Dep. at 57-58).

- In early April 2011, Lady Forest factored $194,542.80 with Porter Capital. (*See* Trupiano Dep. at 57-58).

The total of the accounts receivable that Lady Forest factored with Porter Capital in the forty-one (41) day performance period was $2,164,896.20. (*See* Trupiano Dep. at 57-58). After April 5, 2011 Lady Forest made no further use of the loan facility or the factoring agreement that was in place with Porter Capital in terms of submitting additional invoices or advances from Porter Capital. (*See* Trupiano Dep. at 76). Because Lady Forest was unable to follow through with the complete one year term of the Financing Agreement due to its bankruptcy, the guarantors argue that "[i]t is nothing short of legally absurd and *per se* unconscionable for Porter Capital Corporation to claim a legal entitlement to recovery of the Facility Fee for a full 12

calendar months (or an additional 324 days) when Porter Capital only provided the 'facility' (for which the fee was charged) for only 41 days."[9]  (Doc. #36 at 5).

## IV.    Analysis

Despite the maze of facts set forth above, the dispute embraced in this case can be boiled down to two simple questions: (1) Did Lady Forest breach the Financing Agreement when it filed for bankruptcy?;[10] and (2)  Is Porter Capital entitled to damages under the terms of the Agreement?

The Loan Documents evidence a written contract by and among Porter Capital, Lady Forest, and the Haralson Defendants for the extension of a line of credit to Lady

---

[9]  Lady Forest's calculations proceed as follows:

- For the 41 days that Lady Forest used the facility, Lady Forest owed to Porter Capital $29,999.25 (that is, 3% x $750,000 x 1.33 months = $29,999.25)
- Lady Forest had paid to Porter Capital $26,764.63 as a Facility Fee
- At most, Lady Forest owes Porter Capital $3,234.62 in Facility Fees ($29,999.25 - $26,764.63 = $3,234.62)

(*See* Doc. #36 at 5).  The argument proceeds that since Porter Capital has already used the $36,934.51 in the Reserve Account for its own benefit, Lady Forest owes Porter Capital nothing because Porter Capital netted $33,699.89 at the end of the day ($36,934.51 - $3,234.62 = $33,699.89).  (*See id.*; *see also* Trupiano Dep. at 71).  Under this accounting, Lady Forest contends "no harm – no foul." (Doc. #36 at 6).

[10]  In order to begin answering this question, it is of note to recall that the Facility Fee as set forth in the Financing Agreement is based upon an "assumption" that Porter Capital would collect, through the accounts of Lady Forest, $750,000.00 per month, amounting to a total of $9,000,000.00 (the "Base Purchase Agreement") for the course of the one year Agreement ($750,000 x 12).  The Facility Fee for the term of the Agreement was to be 3% of "assumed" $9,000,000.00, otherwise stated as $270,000.

Forest by Porter Capital.  (*See* discussion *supra* Section III).  As such, basic contract law applies.[11]  To prove its breach of contract claim, Porter Capital must establish: (1) a valid contract binding the parties; (2) the plaintiff's performance under the contract; (3) the defendant's nonperformance; and (4) resulting damages.  *See State Farm Fire & Cas. Co. v. Slade*, 747 So.2d 293, 303 (Ala. 1999); *see also Shaffer v. Regions Fin. Corp.*, 29 So.3d 872, 880 (Ala. Aug. 28, 2009).  All of these elements seem to be in dispute except the first.  (*See* Doc. #31 at 6-8; *see also* Doc. #36 at 9-13).

### A.    Performance under the Contract

Porter Capital cites evidence that it performed under the Financing Agreement by advancing funds and purchasing accounts receivable from Lady Forest while alleging that Lady Forest has failed thereunder.  (*See* Doc. #31 at 8-9).  Paragraph 2 of the Performance Covenant sets out Lady Forest's default as:

(a)    any default in the payment or performance of any instrument (including without limitation the Commercial Financing Agreement), or of the Obligations hereby guaranteed; or

(b)    any warranty, representation, statement, or report made or delivered to Porter Capital by or on behalf of [Lady Forest], or the undersigned, being incorrect, false, untrue, or misleading when given in any material respect whatever; . . .

---

[11] The parties do not dispute that Alabama law applies to this action, nor do they dispute that these are the elements necessary to state a claim for breach of contract in Alabama.  (*See* Doc. #31 at 6-12; *see also* Doc. #36 at 8-13).

> In the event of any of the foregoing, the Obligations hereby guaranteed shall become, for the purpose of this Agreement, **due and payable by the undersigned forthwith without demand or notice**.

(Doc. #31 at 9 (emphasis added); *see also* Performance Covenant).   Under the Security Agreement, obligations of Lady Forest become due and payable if an event of default occurs, including "the appointment of any receiver or trustee for all or a substantial portion of the assets of [Lady Forest]." (Exh. 1 to Trupiano Aff., ¶ 4; Exh. A to Compl., ¶ 24).   Paragraph 14.6 of the Financing Agreement includes Lady Forest's warrant that it had "no outstanding state, federal, or local tax liabilities, and has filed all tax returns or other documents as required by law." (Exh. 1 to Trupiano Aff.).

Porter Capital argues that Lady Forest has been in default of all of the aforementioned Loan Documents.   Lady Forest failed to provide financial records within forty-five (45) days of the end of the first quarter of 2011, thus defaulting under the Performance Covenant.   (*See* H. Haralson Dep. at 42-44).   The event of filing for bankruptcy on April 5, 2011 caused Lady Forest to become a debtor-in-possession, a trustee for the bankruptcy, thus causing violation of the Security Agreement.   *See* 11 U.S.C. § 1107; *see also* Exh. A to Compl., ¶¶ 24.5, 24.10).   The bankruptcy revealed violation of the Financing Agreement, in that Lady Forest had over $150,000 in unpaid *ad valorem* taxes for the year 2010.   (*See* Exh. 3 to Solomon

Decl.).  These defaults, Porter Capital contends, make the Obligations of the Loan Documents immediately due and payable.

Lady Forest makes much of the fact that as of April 18, 2011, Porter Capital made the business decision to make no advances or payments to Lady Forest by making written notification to that effect.  (*See* Doc. #36 at 3, 8; *see also* Trupiano Dep. at 82-83).  As of that date, Lady Forest had "no access to, or ability to use or obtain benefit from the credit facility provided for under the February 23, 2011 Commercial Financing Agreement."  (Doc. #36 at 3-4).  Thus, Lady Forest argues, it is Porter Capital which "either breached or refused to honor its obligations to Lady Forest resulting in a denial of the factoring/credit facility."  (Doc. #36 at 8).

The problem for Lady Forest is that other than making the blanket assertion that it was Porter Capital who breached the Agreement, the undisputed evidence makes clear that the Agreement itself defines a breach, *inter alia*, as occurring when a trustee is appointed for all or a substantial part of Lady Forest's assets.  (*See* Financing Agreement, ¶14.1).  Therefore, when Lady Forest filed for bankruptcy on April 5, 2011, the Loan Documents were breached and the Financing Agreement was renounced by Lady Forest.  *See Baldwin v. Panetta*, 4 So.3d 555, 561 (Ala. Civ. App. 2008) ("A defendant breaches a contract when he or she prevents performance of the contract without the fault of the plaintiff whose duty it was to perform and who is

ready, willing, and able to perform.").  Lady Forest does not, and cannot, refute that the event of filing for bankruptcy caused Lady Forest's renunciation of the Loan Documents.  (*See generally* Doc. #31).

Porter Capital has met its burden of establishing that Lady Forest failed to perform under the Loan Documents.  The question now becomes whether Porter Capital is entitled to any damages as a result of Lady Forest's breach of the contract.

### B.    Damages

The parties seem to understand that the heart of the dispute centers on the damages Porter Capital may be entitled to given Lady Forest's breach of the Loan Documents.  Porter Capital's calculations are relatively simple[12] – the company contends it is entitled to the Facility Fee for the remaining days covered by the initial Agreement as set forth by Paragraph 12.2 of the Agreement, and attorney's fees and costs for the recovery thereof as set forth by Paragraph 22.2 of the Agreement.  (*See* Doc. #31 at 11-14).  Lady Forest argues that the provision setting out the Facility Fee

---

[12]  One of the arguments made by Lady Forest in opposition to the motion for summary judgment is that Porter Capital has made mutually inconsistent sworn statements as to the amount of its alleged damages for which recovery is sought.  (*See* Doc. #36 at 13).  Although this is true, the variance in sums is not as important as the provisions under which Porter Capital alleges it is due damages for breach of guaranty.  Because Porter Capital has consistently maintained that it is entitled damages for the Facility Fee, attorneys' fees, costs, and bankruptcy expenses, it is of no import that the actual number has somewhat varied.  (*See* Doc. #41 at 9-10).

is ambiguous because it is based upon an assumption, and therefore cannot be enforced.  (*See* Doc. #36 at 9-13).

The issue of contractual ambiguity is a question of law for a court to decide. *See Nationwide Ins. Co. v. Rhodes*, 870 So.2d 695, 696 (Ala. 2003).  In determining whether ambiguity exists, a court should apply the common interpretation of the language alleged to be ambiguous.  *See Porterfield v. Audubon Indem. Co.*, 856 So.2d 789, 799 (Ala. 2002).  A contract is ambiguous if it is susceptible to two different interpretations, each of which can be reasonably inferred from reading the contract. *See U.S. v. Bradley*, 2012 WL 2890904 at *5 (11th Cir. July 13, 2012); *see also Frulla v. CRA Holdings, Inc.*, 543 F.3d 1247, 1252 (11th Cir. 2008).  When the terms of a contract are unambiguous, the contract's construction and legal effect become a question of law for the court, and when appropriate may be decided by summary judgment.  *See Ocean Reef Developers II, LLC v. Maddox*, – So.3d –, 2012 WL 1760211 at *3 (Ala. Civ. App. May 18, 2012).  A court may not twist the plan meaning of the terms in a contract to create an ambiguity under the guise of interpretation.  *See Booth v. Newport Television LLC*, – So.3d –, 2011 WL 6275695 at *5 (Ala. Civ. App. Dec. 16, 2011).

There is nothing ambiguous (latent or otherwise) about the provision of the Agreement which requires a Facility Fee.[13]  Paragraph 12.1 of the Agreement is the only place where the term "assumption" is used.  This Paragraph indicates that the parties negotiated the Facility Fee to be based on an *averaged amount* of $750,000 per month.

> The rebates set forth in the rebate schedule attached hereto have been established after negotiations between [Lady Forest] and Porter Capital on the assumption that [Lady Forest] will tender to Porter Capital for the purchase hereunder acceptable Accounts Receivable averaging at least seven hundred fifty thousand dollars a month (the "Base Purchase Amount") during the Initial Term and each renewal term.

(Exh. A to Compl., ¶ 12.1).  The fee had to be based on something, and for these parties, it was based on the presumption that Lady Forest would factor at least $750,000 per month with Porter Capital.  Of note is that the Agreement does not provide for a shifting fee based on shifting factoring.  Instead, the fee remains constant based on a presumption that Lady Forest would factor at least $750,000 per

---

[13]  Because the Agreement contains no ambiguity, the court cannot look beyond the four corners of the instrument.  *See Martin v. First Nat'l Bank of Mobile*, 412 So.2d 250, 253 (Ala. 1982).  Nor does there exist any collateral matter which makes the meaning of the term "assumption" uncertain.  That a guarantor might have thought the $750,000 assumption was removed from the Agreement does not change the meaning of the term as actually contained in the Agreement.  (*See* Doc. #36 at 11-12) ("Porter Capital was clearly advised at the time the subject financing agreement was made that Lady Forest could not perform as assumed.  The three Defendants, in reliance upon Hugh Haralson, III disputed this term of the agreement, and Lady Forest's expressed intent clearly differed from that which Porter Capital now wishes to assert as its sole basis for recovery.").

month.   Porter Capital agreed to extend to Lady Forest the line of credit in

consideration of receiving the Facility Fee for the term of the Agreement.  (*See* Exh.

A to Compl., ¶ 12.2).

Having established that Lady Forest breached the Agreement by failing to pay

the Facility Fee for the term of the Agreement, the amount owing to Porter Capital is

at issue.  As a general rule, damages in a breach of contract action are "that sum

which would place the injured party in the same condition he would have occupied

if the contract had not been breached."  *Ex parte Steadman*, 812 So.2d 290, 295 (Ala.

2001).  Had Lady Forest not breached the Agreement, Porter Capital would have

received an additional $243,235.37 in Facility Fees, minus whatever amount Lady

Forest would pay to Porter Capital in fees each term.  (*See* Trupiano Aff., ¶ 13).

Since Lady Forest paid Porter Capital no additional fees for the term of the

Agreement, $243,235.37 is the minimum amount Porter Capital has been damaged

as a result of the breach.[14]

---

[14] Lady Forest alleges that the damages asserted by Porter Capital are legally unconscionable.  (*See* Doc. #36 at 14-16).  The 3% Facility Fee, which Porter Capital asserts would have been non-negotiable in the event it had been an issue during negotiations (*see* Trupiano Dep. at 26-27), added to the contractual interest rate of 16.95%, would *effectively* equate to 28.16% in interest for the 41 day period (given that Porter Capital received $2,164,876 for the 41 days).  (*See* Doc. #36 at 15) ("Thus, Porter Capital [excluding its other claimed damages] is effectively attempting to charge the three Defendant Guarantors 28.16% in interest or finance charges in exchange for a 41 day period that the financing/factoring agreement was in place.").

It is true that an unconscionable contractual provision must be examined in light of all of

In addition to the contractual Facility Fees due and owing to Porter Capital, the Agreement makes clear that in the event of a breach, Porter Capital is entitled to recover "the actual amount fo all fees, costs, and expenses, including but not limited to attorneys' fees, which Porter Capital may incur in any action to enforce this Agreement . . . or in connection with any federal or state bankruptcy or insolvency proceeding commenced by or against [Lady Forest]." (Trupiano Aff, Exh. 1, ¶ 22). Provisions such as these are enforceable under Alabama law, and Lady Forest does not argue otherwise. *See Subway Rest., Inc. v. Madison Square Assoc., Ltd.*, 613 So.2d 1255, 1257 (Ala. 1993) ("In Alabama, in state law causes of action, attorney fees are recoverable as part of the costs of the action . . . when provided in a contract."); (*see* Doc. #36 at 15-16). As of July 30, 2012, Porter Capital had expended $75,435.10 in attorneys' fees and costs to recover for Lady Forest's breach of contract. (*See* Solomon Aff., ¶¶ 5, 7). Porter Capital expended an additional

_____

the circumstances and is defined as one "such as no man in his sense and not under delusion would make on the one hand, and as no honest and fair man would accept on the other." *Layne v. Garner*, 612 So.2d 404, 408 (Ala. 1992). The problem for Lady Forest is that the circumstances do not make the provision for 3% in Facility Fees unconscionable. On a predicted $9,000,000 of factoring, 3% in Facility Fees and 16.95% interest are reasonable terms for sophisticated business men to enter into. That there was a possibility of breach by bankruptcy was surely a scenario of which Lady Forest was aware, and careful review of the Agreement could have presented Lady Forest with a hypothetical situation such as the one currently before the court. (*See* Doc. #41 at 3). Defendants here used their bargaining power to ensure that the contract terms were not unreasonably favorable to Porter Capital or one-sided. *See Layne*, 612 So.2d at 408.

$18,000 in connection with the bankruptcy commenced by Lady Forest.  (*See* Trupiano Aff., ¶ 15; Exh. A to Compl., ¶ 22).  Therefore, the total amount due and owing to Porter Capital for Lady Forests's breach of the Agreement is $299,735.96.

## V.    Conclusion

For the reasons asserted herein, the Motion (Doc. #30) for Summary Judgment of Porter Capital Corporation is due be granted.  Porter Capital Corporation is entitled to recover from the guarantors of Lady Forest $299,735.96.  A separate Judgment will be entered.

**DONE** this the ___10th___ day of October, 2012.

_James N. Hancock_

_____

SENIOR UNITED STATES DISTRICT JUDGE